# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:20-CV-03181-DDD-SKC

_____

SEAN COUTURE,

      Plaintiff

v.

UNITED AIRLINES, INC.;
SIMPLICITY GROUND SERVICES, LLC
d/b/a MENZIES AVIATION;
COLORADO ASPHALT SERVICES, LLC
d/b/a COLORADO ASPHALT SERVICES, INC.,
and COLORADO ASPHALT SERVICES, LLC
d/b/a CASI.

      Defendants

_____

ZOOM VIDEO RULE 30(b)(6) DEPOSITION OF COLORADO
ASPHALT SERVICES, as given by MIKEL COZZA
April 4, 2022

_____

      Pursuant to Notice and the Federal Rules of
Civil Procedure, the Rule 30(b)(6) video deposition
of Colorado Asphalt Services, as given by
MIKEL COZZA, taken by Defendants Simplicity Ground
Services, LLC, was via remote Zoom videoconference
on Monday, April 4, 2022, at 10:00 a.m., before
Jason T. Meadors, RPR, CRR, CRC.



APPEARANCES

JASON GLENN ALLEMAN, ESQ.
Anderson Hemmat, LLC
5613 DTC Parkway, Suite 150
Greenwood Village, Colorado 80111
(303)782-9999
jason@andersonhemmat.com
    For the Plaintiff

KATHLEEN J. JOHNSON, ESQ.
Treece Alfrey Musat P.C.
633 17th Street, Suite 2200
Denver, Colorado 80202
(303)292-2700
kjohnson@tamlegal.com
    For the Defendant United Airlines, Inc.

ANDREW C. JOHNSON, ESQ.
Condon & Forsyth, LLP
1901 Avenue of the Stars, Suite 1050
Los Angeles, California 90067
(310)557-2030
ajohnson@condonlaw.com
    For the Defendant Simplicity Ground Services, LLC

MAX K. JONES, ESQ.
Montgomery Amatuzio Chase Bell Jones
4100 East Mississippi Avenue, Suite 1600
Mountain Towers
Denver, Colorado 80246-3048
(303)592-6600
mjones@mac-legal.com
    For the Defendant Colorado Asphalt Services, LLC

Also Present:
  Jordan McHugh, videographer



Page 3

TABLE OF CONTENTS

ZOOM VIDEO RULE 30(b)(6) DEPOSITION OF COLORADO
ASPHALT SERVICES, as given by MIKEL COZZA

EXAMINATION                                          Page

BY MR. JOHNSON                                 5, 90, 95

BY MS. JOHNSON                                    85, 96

BY MR. ALLEMAN                                    87, 95

BY MR. JONES                                          93


EXHIBITS                                             Page

Exhibit A  Notice of Deposition                        14

Exhibit B  United/CASI Contract                        17

Exhibit C  Photograph                                  88

Exhibit D  Photograph                                  91



Page 4

THE VIDEOGRAPHER:  We are now on the record. This begins videotape number 1 in the deposition of Mikel Cozza, corporate representative for CASI, in the matter of Sean Couture versus United Airlines, Inc., et al., in the United States District Court for the District of Colorado, Case Number which is 1:20-CV-03181-DDD-SKC.

Today is Monday, April 4th, 2022, and the time is 10:00 a.m.

This deposition is being taken remotely at the request of Magna Legal Services.  The videographer is Jordon McHugh of Magna Legal Services, and the court reporter is Jason Meadors of Magna Legal Services.

Will counsel and all parties present state their appearances and whom they represent, after which the court reporter will swear in the witness.

MR. JOHNSON:  My name is -- sorry, go ahead.

MR. ALLEMAN:  Jason Alleman for the plaintiff, Sean Couture.

MR. JOHNSON:  Andrew Johnson for defendants, Simplicity Ground Services.

MS. JOHNSON:  Kathleen Johnson, on behalf of United Airlines.

MR. JONES:  Max Jones on behalf of Colorado Asphalt Services, Inc.



Page 10

C Concourse, the hangar, as well as Stapleton Training Center. I handle all the billing, invoicing, contracts for United Airlines. Also help -- not help. I am in charge of fielding the proper personnel per requests on any given snowstorm as well.

Q    And have those been the job duties and responsibilities of the snow operations manager for the entire time that you've held that position?

A    Yes.

Q    And I think the first thing you said, part of your duties and responsibilities as the snow operations manager was to coordinate field operations for United Airlines at A Concourse and B Concourse?  Is that correct?

A    Yes.

Q    Okay.  So is it correct that Colorado Asphalt Services -- I'm going to refer to today as CASI -- has provided what you described as snow operations for United Airlines at Concourse B for at least the last 10 years?

A    Yes.

Q    And that's A Concourse and B Concourse at Denver International Airport, right?

A    Yes.

Q    And when you say that you're responsible or



Page 32

Q    And do you have any personal knowledge of the weather conditions at DIA -- I'm sorry.

Do you have any personal knowledge of CASI's understanding of the weather conditions at DIA, Concourse B, from January 21, 2019, to January 22, 2019?

A    Yes.

Q    Okay.  And what is that personal knowledge?

A    We had a snow event that required us to be to the airport at 5:00 p.m. on January 21st.  We did our snow removal services and were released by United on the 22nd at 2:00 p.m.  We had prephoned, called out, for more operations at 8:00 p.m. on the 22nd.

Q    Okay.  And were you involved in those operations?

A    Yes.

Q    And we'll get to it later, I guess, but do you recall what the weather conditions were in Denver in that time period, at DIA in that time period?

A    I recall it was snowing.  We had to clear the snow.  And we were released when the sun was out the next day.  And called back for ice mitigation at 8:00 p.m. on the 22nd.

Q    Okay.  Did you do anything -- other than this personal knowledge that you've described, did you do



Page 33

anything else to prepare to testify on category number 5 today?

A     No.

Q     The next category is category number 6.  Do you see that one?

A     Yes.

Q     And that category is CASI's understanding of the ground conditions on the ramp and tarmac at DIA, Concourse B, from January 21, 2019, through January 22, 2019.

Did I read that correctly?

A     Yes.

Q     And are you here to testify on that category?

A     Yes.

Q     And do you have any personal knowledge of that category?

A     Yes.

Q     And what is your personal knowledge on that category?

A     From what I can remember, we were on-site early for the storm.  Ground conditions were clear for about five hours until we started snow removal services.  From then, we concluded our services at 2:00 p.m. the next day, when all snow was cleared from areas that we could access with our vehicles, and we


MAGNA
LEGAL SERVICES

Page 34

were released at 2:00 p.m.

Q    Okay.  Do you recall anything about the ground conditions other than what you just told me?

A    No.

Q    Other than discussions you may have had with your attorney, did you do anything else to prepare to testify on category number 6?

A    No.

Q    Do you see category number 7 on this page?

A    Yes.

Q    And that category is CASI's performance of any and all obligations, rights, and responsibilities pursuant to any agreement to which CASI was a party that were in effect on January 22, 2019, which related to any services performed by CASI at DIA during the time period of January 21, 2019, through January 23, 2019.

Did I read that correctly?

A    Yes.

Q    And are you here to testify on this category?

A    Yes.

Q    And do you have any personal knowledge of this category?

A    Yes.

Q    Okay.  What's the source of your personal



Page 47

A    Yes.

Q    Okay.  And that says, Services shall collectively mean the labor, equipment, and materials necessary to perform equipment maintenance, equipment fueling, ice melting, snow clearance, and snow removal, in addition to other related services at United during the snow season in accordance with United's specifications, as they may from time to time be amended or modified by United.

Did I read that correctly?

A    Yes.

Q    And was it CASI's understanding that the services that they were to perform for United in or around January 2019, pursuant to this contract, included a separate services of ice melting, snow clearance, and snow removal?

A    Yes.  We are to remove snow with our plow trucks, skid steers, vehicles that we man, as well as distribute ice melts or liquid ice pre-treatment with our vehicles that are equipped to do so.

Q    Okay.  Sorry.  One second.

Okay.  So the next definition under here, number 15, is Snow Clearance.  Do you see that?

A    Yes.

Q    And so that states, Snow clearance shall mean



Page 49

A    That service is more defined for the Stapleton facility.  If snow needed to be taken away from the facility if it was beginning to pileup, because there's no melters or operations like that on-site there, so if need be, we would load it into trucks and we'd remove snow from the actual site.

Q    Got it.  On then number 18, do you see that one?

A    Yes.

Q    Okay.  That says, Snow removal services shall mean any or all snow removal tasks.

Did I read that correctly?

A    Yes.

Q    Okay.  So am I correct that CASI understood that there were three services it was expected to perform for United pursuant to this contract at DIA.  That included ice melting, snow clearance, and snow removal; is that right?

A    Yes.  Snow clearance is what is done at the airport.  Snow removal is what's done on offsite facilities where that is deemed necessary.  All of which are done with our trucks, skid steers, and tandems per location.

Q    Got it.  Okay.  And what about ice melting?  Is that performed at DIA?  Was that one of the services



MAGNA
LEGAL SERVICES

Page 50

CASI performed at DIA?

A    Yes.  Ice melt is applied when ice is present to break up -- to break it up.

Q    And were those ice melting services that you described performed at Concourse B at DIA in January of 2019?

A    Yes.

Q    Including gate B50?

A    Ice -- ice melt is applied to the entire B Concourse.  It's not broken up for gate.

Q    But it would include the gate B50 area, correct?

A    Yes.

Q    Okay.  I'm now at page COASPHALT 211.  Do you see that at the bottom part of the right page that's up?

A    Yes.

Q    And here, item 9, we have a section titled Services Management.  Did I read that correctly?

A    Yes.

Q    Okay.  Let me scroll through slowly so you can see it, unless you want to look at this section on the hard copy you have with you.  But it goes -- so the services management goes from the middle of page 211 to kind of the lower part of page 212.  Is that right?



Page 63

had started providing its services for United,
including snow removal, snow clearance, and ice melting
at DIA, am I correct that CASI's understanding of what
they were supposed to do is follow United's direction
in terms of being discharged from performing those
duties and services?

    A    Yes.

    Q    Okay.  So CASI would never say to United, We
still have a little bit more work to do.  There's a
potential for ice.  We should spread some ice melt.
They would just go home if told to do so.

    A    United has representatives on the field as
well.  We work together to verify that we are good to
go home.  It is their direction when we are to leave.

    Q    So does CASI have representatives on the
field to determine when you're good to go, as I believe
you've described?

    A    We perform our operations until we are
notified that we are to be released.  Their standards
as far as snow being gone from the gate.

    Q    Well, I understand that.  But, again, my
question is little bit different.

         I understand that United has representatives
present at DIA to monitor the situation.  Does CASI
have representatives on-site at DIA while -- while foul



Page 64

weather services are being performed to determine whether or not it's safe to stop ice melting, snow clearance, snow removal?

A    We will let them know when we think that we are getting close to being done and then they have to verify that we are good to be released.

Q    I see.

A    So, yes, we're coordinating with them, as far as that goes, but in the end, we cannot to be released until we're released by United.

Q    So then the way it works, when CASI was providing its services, it's you know, snow removal, snow clearance, ice melting services, CASI would monitor the progress of the work and then tell the United representatives that CASI believes the work has been completed or it's nearing completion, and then United would come out and verify it?

A    Correct.

Q    Who were -- in January of 2019, who was it from CASI that would have that communication with United that you just described?

A    That was me.

Q    Okay.  And who would you speak with at United?

A    There's quite a few leads that are out there,



Page 65

but I believe back in that day, it was Darrell
Morrison, John Arkin, and Jake Chong that were on-site
then.

Q    And so would you personally inspect the ice
melting, snow removal, snow clearance, on any given day
performed by CASI?

A    Yes.

Q    And how would you do that?

A    By assessing each gate and making sure that
there's nothing that we needed to do.

Q    And can you walk me through the process of
how you would assess each gate?

A    You need to drive around the concourse and
look at each gate.  If there's still a plane parked
there that's been there overnight, that gate would have
to still be cleared.  If they're all bare concrete, as
they usually are when we leave, then we would be
released.

Q    And focusing on B Concourse -- I'm sorry,
strike that.

My understanding is that at DIA, they're two
different types of boarding gates.  There is a jet
bridge boarding gate where passengers board the
aircraft by walking down the jet bridge onto the
aircraft.  And then there's also ground boarding gates



Page 80

A    No, that's a regulation.  We don't know the condition -- by condition, I mean, where the jet bridge is.  It's height.  And things like that.  So you can't guarantee that you can pass under there safely without running into it or hitting a cable.  There's -- there's wires that go on there, and on the ground as well.  Things like that.

Q    And do you know what specific regulation that is?

A    I do not.

Q    So are those the two rules, I guess, for where CASI can and cannot go on Concourse B.  Can't be within 50 feet of an aircraft and can't go underneath a jet bridge?

A    On Concourse B, yes.

Q    Okay.  Did you work -- were you out at DIA on January 21 and January 22 of 2019?

A    Yes.

Q    Okay.  And can you tell me what -- first, what -- what did CASI do that day?  Starting with the -- let's just cover the whole time period, from the 21st through the 22nd.

A    We arrived at 5:00 p.m. on the 21st.  We did not do anything for about five hours.  We were on standby, if you will, until we commenced snow removal



Page 81

operations at 10:00 p.m.  And then we proceeded to keep with operations until 2:00 p.m., the following day, when we were released.  So almost a full day of snow removal.

        And then from there, we were contacted to come back to distribute ice crystal at B Concourse at 8:00 p.m. on the 22nd.

    Q    Sorry.  You were contacted to come back to distribute ice crystal at -- ice crystal at B Concourse at what time?

    A    8:00 p.m.

    Q    Okay.  And when CASI was called back to distribute ice crystal -- sorry, I don't know why I'm having such a hard time with that word -- ice crystal, I assume it did it, right?

    A    We -- it did what?

    Q    CASI did distribute the ice crystal over the B Concourse, correct?

    A    Yes.

    Q    Okay.  How long did that process take, from 8:00 p.m. until when was it done?

    A    Midnight.  Four hours.

    Q    And was the manner in which ice crystal was distributed in those four hours how you've already described, where it comes off the back of the truck,



Page 90

Q    And no responsibility to report that to United.

A    No.

Q    Okay.  All right.  I'm sorry.  I just want to clarify something you said earlier, and I don't know if I understood this correctly.

Did you say that -- that CASI was not required to clean off the tarmac of gate B50 because it's a public area?

A    No, that was referring to common areas in general.  There are no common areas on the concourse, because you get access to B Concourse, you need to be badged, so it's not considered a common area.  A common area is where public can access.

Q    Okay.  So gate B50 is not considered a common area.

A    No.

Q    Okay.

MR. ALLEMAN:  Those are all the questions I have.  Thank you.

EXAMINATION

BY MR. JOHNSON:

Q    I just have a -- excuse me, a few follow-ups.  I'm going to share my screen.  I guess this will be, what, Exhibit D.  It's similar to the exhibit



Page 91

that Mr. Alleman just showed you.  Can you see this?

A    Yes.

Q    Okay.

MR. ALLEMAN:  Can we just make that Exhibit C?  I think that's -- that shows what --

MR. JOHNSON:  Well, I'd like to keep yours, too, because yours was a little bit different.  So if it's okay, I'd like to do both, if you don't mind.

MR. ALLEMAN:  No, that's fine.  I'll just upload it in the Chat, there.

Q    (By Mr. Johnson)  Okay.  Can you see my cursor, Mr. Cozza?

A    Yes.

Q    Okay.  I believe -- well, I believe it was represented to you that this depicts gate B50.  If that representation hasn't been made, I'll make it now.

Now, my understanding of your testimony a moment ago is that you pointed out -- see where my cursor is tracing this sort of this circular pattern in the snow?  Is that right?

A    Yes.

Q    Okay.

A    Yeah.

Q    And down below it, I think I see another one. Is that accurate?


MAGNA
LEGAL SERVICES

Page 92

A    That's hard to say there.

Q    Okay.  Fair enough.  So the one circular pattern that you identified goes essentially from the directly below the jet bridge down to a utility tug, correct?

A    Yes.

Q    And my understanding of your testimony was that everything that's, essentially, to the left of this area would have been an area that CASI did do some ice and/or snow removal.  I believe you said that this reflects that a truck came in and turned; is that right?

MR. ALLEMAN:  Object to form.

A    Yes.

Q    (By Mr. Johnson)  Okay.  So do you see where my cursor is now?  It's tracing the area that goes from that circular pattern, the top of the circular pattern, to bottom of the circular pattern, to the left.  It goes past that tug and then up to the nose of the aircraft?  Do you see that?

A    Yes.

Q    Okay.  So that's an area that -- that CASI would have cleared snow and/or ice, right?

MR. ALLEMAN:  Object to form.

A    Yes.



Page 102

REPORTER CERTIFICATE

I, JASON T. MEADORS, Registered Professional Reporter, Certified Realtime Reporter, Certified Realtime Captioner, and Notary Public of the State of Colorado, appointed to take the video deposition of

MIKEL COZZA,

certify that prior to the deposition the witness was sworn by me to tell the truth; that the deposition was taken by me via Zoom videoconference on April 4, 2022.

I certify that the proceedings were reduced to typewritten form by computer-aided transcription consisting of 102 pages herein; that the foregoing is an accurate transcript of the proceedings.

I certify that I am not related to, employed by, of counsel to any party or attorney herein, nor interested in the outcome of this litigation.

I further certify review of the transcript was requested.

Attested to by me this April 15, 2022.

*Jason T. Meadors*
_____
Jason T. Meadors, RPR, CRR, CRC


My commission expires
January 27, 2025

Re:  Couture v. United Airlines, Inc., et al.
Reporter:  JM
Proofer:  SLM

